# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Shannon Carnahan | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | Jury Demanded |
| | ) | |
| McLean County Sheriff's Office | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Shannon Carnahan ("Plaintiff"), by his undersigned counsel, complains of Defendant, McLean County Sheriff's Office ("Defendant"), as follows:

### Jurisdiction and Venue

1. Plaintiff is alleging a violation of his civil rights under the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* (the "ADA"), as amended by the Americans with Disabilities Act Amendments Act of 2008. This Court has jurisdiction over such claims pursuant to 28 U.S.C. §§1331 and 1343(4).

2. Venue is proper in this judicial district under 28 U.S.C. §1391(b) as the acts complained of occurred in the Central District of Illinois, and at all relevant times Defendant was doing business in the Central District of Illinois.

### The Parties

3. Plaintiff is a 52-year-old male resident from the Central District of Illinois, and at all relevant times herein worked for Defendant. At all relevant times, Plaintiff was, had a record of, and/or was regarded by Defendant as an "individual with a disability" within the meaning of

the ADA in that he suffers from adjustment disorder with mixed anxiety and depressed mood, adjustment insomnia, and panic disorder.

4. Specifically, Plaintiff's condition substantially limits his major life activities of thinking, concentrating and interacting with others.

5. Defendant maintains the McLean County of Illinois law enforcement system and its jail system with its principal place of business in Bloomington, Illinois, McLean County. Defendant employs more than 100 employees countywide. At all relevant times, Defendant was an "employer" within the meaning of the ADA.

### Procedural Requirements

6. On or about January 23, 2020, Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") for disability and age discrimination, satisfying the requirements of 42 U.S.C. §2000e-5(b) and (e). Plaintiff's Charge of Discrimination was timely filed within three hundred (300) days after the alleged unlawful employment practice occurred. Thereafter, on February 23, 2021, the EEOC issued Plaintiff his Notice of Right-to-Sue letter with respect to such Charge, a copy of which is attached as Exhibit "A." This Complaint has been filed less than ninety (90) days after Plaintiff's receipt of his Notice of Right-to-Sue letter.

### Discrimination in Violation of the Americans With Disabilities Act

7. After over twenty (20) years of employment with the Defendant, Plaintiff started experiencing severe stress and anxiety.

8. Plaintiff began therapy in March 2018, when he first requested Family and Medical Leave for the said medical issue.

9. On or about January 16, 2019, Plaintiff took medical leave of absence for the said medical issue, as the symptoms intensified.

10. Plaintiff qualified for FMLA time, and was told by Defendant that he would get four hundred (400) hours of FMLA time followed by accrued sick time that amounted to additional six hundred (600) hours.

11. Initially, Plaintiff was scheduled to take the FMLA leave from January 16, 2019, until March 13, 2019, however, the FMLA request was then updated and extended until March 18, 2019, and later on until March 31, 2019.

12. Before his return, Plaintiff was recommended by his doctor to take additional time off to develop techniques that would mitigate his medical condition.

13. To comply with the doctor's recommendation, Plaintiff utilized his unused Paid Time Off (PTO) he had accrued through his perfect attendance before experiencing medical issues.

14. Throughout his FMLA leave, Plaintiff complied with all the requirements of such leave, i.e., informed the employer about any changes to the leave, checked in with the employer on a monthly basis.

15. During his FMLA leave and PTO, Plaintiff was treated by Jennifer Stevens, MD (on January 18, January 23, February 5, February 12, February 28, March 1, March 4, March 7, March 12, March 19, and March 25, 2019) and regularly met with Employee Assistance Program Counselor William Brunner, MS, LCPC (on January 29, February 28, March 6, March 11, March 25, April 8, April 15, April 23, April 29, May 6, May 9, 2019).

16. Plaintiff presented Defendant with the documentation related to his medical treatment and the requirement for accommodation, i.e., leave requests, updated FMLA requests.

3

17. Throughout his time-off Plaintiff informed Defendant about his willingness to return to work, and was hoping that would happen as soon as his health permits him to.

18. On June 26, 2019, Plaintiff contacted Desk Sergeant Thomas McCormick ("McCormick") and informed him about the planned return on June 27, 2019.

19. During that conversation, McCormick advised Plaintiff to bring in a doctor's note releasing Plaintiff to return to work full duty without any restrictions, which Plaintiff was issued by Thomas Murphy, DO CAQSM, along with a medical note of absence on June 24 through June 26, 2019.

20. Shortly after the conversation with McCormick, on June 26, 2019, Plaintiff was called by Chief Deputy Jamie Kessinger, who informed Plaintiff that as of Monday, June 17, 2019, Plaintiff's time off was exhausted and no additional time off would be granted.

21. On June 25, 2019, Defendant terminated Plaintiff's employment with the stated reason of job abandonment.

22. However, Plaintiff learned that on June 26, 2019 a conversation took place between Union Representative David Nixon with Chief Deputy Kessinger, where Kessinger s terminated Plaintiff because he was perceived as not fit to return, despite doctor's clearance to return to work full duty.

23. Ultimately Defendant did not inform Plaintiff that his available time off was about to expire.

24. Furthermore, Defendant waited nine (9) days to inform Plaintiff that his FMLA time was about to expire.

25. Plaintiff knows of other similarly situated employees, who were not terminated for fully utilizing their time off to treat their medical conditions.

26. Moreover Plaintiff knows of other similarly situated employees who were notified by the Defendant that their FMLA time was ending and allowing them to return to work so they would not face termination.

27. Plaintiff learned of this from conversations with former and current employees of Defendant, i.e., Joe Schapmire, Dane Thompson, Jarod Maxedon, Robert Gary Underwood, and Raymond Loftus.

28. Furthermore, Defendant's letters sent by Assistant Superintendent Diane Hughes dated March 22, 2019, and by Sheriff Jon Sandage demonstrate discrepancy regarding the expiration date of available FMLA time.

29. The discrepancy in qualifying FMLA and sick time is also on display in Plaintiff's employee attendance record for 2019, wherein sick time off was noted from January 16 until March 14, 2019 (however, the March sick time was not counted into the absence summary but instead was qualified as FMLA) while FMLA leave continued until June 7, 2019. *See Plaintiff's employee attendance record 2019.*

30. Moreover, other similarly situated employees were checked in with by Defendant's agents to see whether they needed some assistance or simply to get to know how they were feeling, e.g., Correctional Officer Chris Gibson called multiple times by Diane Hughes, Sergeant Kerr, Mattheew Proctor, and Sheriff Jon Sandage inquiring about how he was doing and whether he needed anything while Gibson was off duty due to COVID-19 infection.

31. Plaintiff was never contacted by Defendant with an inquiry about his status or whether he needed assistance.

32. Termination of Plaintiff's employment by Defendant, in disregard to his clearance to return to work full duty without restrictions, was clearly an effort to punish and retaliate against Plaintiff for requesting the aforesaid medical leave, and the discrepancies between recorded nature of time off categories, and between the termination reason stated in the

termination letter and the reason revealed during the conversation between Union Representative Dixon and Chief Deputy Kessinger hinder Defendant's reliability and suggest that the reason stated in the letter was pretextual and Plaintiff believes there are reasons indicating such treatment of employees is not uncommon.

### DEFENDANT VIOLATED PLAINTIFF'S RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT AS AMENDED

33. Plaintiff herein adopts and incorporates paragraph 1-32 above.

34. In violation of the ADA, Defendant:

   a. Improperly limited, segregated, or classified Plaintiff in a way that adversely affected his job opportunities or status because of his disability, his record of a disability, or Defendant's perception of Plaintiff as being disabled;

   b. Improperly utilized standards, conditions or methods of administration that: (1) have the effect of discrimination on the basis of Plaintiff's disability, his record of a disability, or Defendant's perception of Plaintiff as being disabled, or (2) perpetrated such discrimination;

   c. Improperly excluded or denied Plaintiff equal job duties or benefits because of his disability, her record of a disability, or Defendant's perception of Plaintiff as being disabled.

35. Defendant further violated Plaintiff's rights under the ADA by, inter alia:

   a. Unwarranted, repeated and unduly harsh criticism of Plaintiff, e.g., then Superintendent Jamie Kessinger belittling Plaintiff in front of Sergeant Rod Frank and Sergeant Molli Churchill telling Plaintiff that he himself was the cause of the issues he was having, Sergeant Rod Frank telling Plaintiff to "get your shit together" upon hearing about Plaintiff's

persisting medical condition, disclosing Plaintiff's medical condition to inmates.

    b.    Deliberately depriving Plaintiff of his right to equal terms and conditions of employment as a result of his disability, record of disability or perception of his disability; and

36. As a direct and proximate result of Defendant's violations of the ADA, Plaintiff has suffered severe emotional distress, pain, outrage and humiliation. Plaintiff has also lost and will continue to lose income, including but not limited to wages, raises, insurance and other employment benefits.

37. The above-described conduct of Defendant was willful and recklessly indifferent to Plaintiff's federally protected rights under the ADA, and warrants the imposition of punitive damages against Defendant.

**WHEREFORE**, Plaintiff, Shannon Carnahan prays that this Court grant the following relief:

    A.    Advance this case on the docket, order a speedy hearing or trial at the earliest practical date, and cause this case to be expedited in every possible way;

    B.    Grant judgment in favor of Plaintiff and against Defendant for compensatory damages for emotional pain, misery, suffering, and for punitive damages in the sum of $300,000;

    C.    Award Plaintiff his costs of litigation, including witness fees and reasonable attorney's fees incurred in connection with this action;

    D.    Award Plaintiff his lost wages and job benefits, plus interest so as to render him whole from the unlawful termination; and

    E.    Grant Plaintiff such further and additional relief as this Court deems just and appropriate.

Dated: April 20, 2021.

By: _____
One of His Attorneys

Joshua N Karmel, Illinois Bar No. 6208369
The Law Offices of Joshua N. Karmel
5 Revere Dr., Ste 200
Northbrook, IL 60062
847-282-4942
Jklaw1226@gmail.com


Brad E Karlin, Illinois Bar No. 6307899
Of Counsel, The Law Offices of Joshua N. Karmel
5 Revere Dr., Ste 200
Northbrook, IL 60062
847-282-4942
bk.karlinlegal@gmail.com